**Opinion filed April 9, 2026**



# In The

# Eleventh Court of Appeals

_____

## No. 11-25-00137-CV

_____

## IN THE ESTATE OF KARA GALE MURPHY WATSON, DECEASED

**On Appeal from the 42nd District Court**
**Callahan County, Texas**
**Trial Court Cause No. 22605**

### M E M O R A N D U M   O P I N I O N

This is an appeal of the trial court's order admitting a will to probate as a muniment of title. In the proceedings below, James Michael Watson objected to the probate of his mother Kara's will, alleging that his sister, Appellee, Mary Gale Watson Matulka, was in default for failing to offer the will to probate within the four-year time period prescribed by the Estates Code. TEX. ESTATES CODE ANN. § 256.003(a) (West 2020). Following a bench trial, wherein the trial court found

that Mary Gale was not in default, the trial court admitted the will to probate as a muniment of title. *See id.* § 257.001.

In a single issue, Appellant, Consuelo "Connie" Rivas (Connie), acting individually and as the independent executor of James Michael's estate, contends that the evidence was legally insufficient to support the trial court's finding that Mary Gale exercised reasonable diligence in admitting the will to probate and was not in default for failing to offer the will to probate during the four-year statutory period immediately following Kara's death. We affirm.

## I. *Factual and Procedural History*

Kara Gale Murphy Watson (Kara) died on April 11, 2014, after being involved in a head-on collision with a tractor trailer. At that time, Kara was survived by:

(a) her husband, James Robert Watson (James);

(b) their three adult children;

 (1) James Michael Watson (James Michael);

 (2) Mary Gale Watson Matulka (Mary Gale), Appellee; and

 (3) Rebecca Amy Watson McCoy (Rebecca Amy);

(c) and other individuals relevant to this matter,

 (1) Judith Muriel Sidenblad Watson (Judith), James Michael's wife; and

 (2) Consuelo "Connie" Rivas (Connie)- James Michael's caretaker and sole beneficiary and executor of his estate.

Approximately nine years later, on November 2, 2023, Mary Gale filed an application to probate Kara's will as a muniment of title. Kara's will named Mary Gale as the executor. Under the terms of the will, Kara left her 240-acre farm to her three children to be shared equally. The will contained the following additional provisions:

James "shall live in the farm home the rest of his life if he wishes";

2

Judith "can live in her trailer" on the property "for the rest of her life, if something should happen" to James Michael;

"[s]ince [James Michael] and [Rebecca Amy] do not have children, at their death, their portion of the estate will revert to [Mary Gale]";and

"[n]o portion of the farm may be sold during their lifetime, except to each other by agreement."

By the time Mary Gale filed the application to probate Kara's will, James, Judith, and Rebecca Amy had passed away.

On November 22, 2023, James Michael filed an original answer, pleading a general denial and asserting that Mary Gale was in default for having filed for probate more than four years after Kara's death. James Michael died nearly one year later, on December 24, 2024, and the suit proceeded with Connie, acting individually and as executor of James Michael's estate.

On April 24, 2025, the trial court held a hearing on Mary Gale's application to probate Kara's will. Mary Gale's husband, Gerald Matulka, was the first of three witnesses to testify. Gerald stated that he and Mary Gale had maintained the property at issue and paid taxes on it since Kara's passing. According to Gerald, after Kara died in 2014, James came to live with them, due to his macular degeneration and resulting blindness. Eventually, James was placed in a nursing home, and he died in 2015. In 2016, Gerald lost his job. When Gerald found temporary employment in 2017, it took him out-of-state and away from Mary Gale and their grandchildren, who were also residing with them at the time. In December 2017, when the job ended, Gerald was unemployed until he accepted a job in Massachusetts in April 2018. Gerald testified that throughout this period, Mary Gale turned to alcohol and eventually needed a liver transplant.

During cross-examination, Gerald testified that he moved Mary Gale to Massachusetts to be with him in 2018, and that in 2021, they purchased a six-acre

property. Gerald explained that he worked as an electrical engineer. Gerald confirmed that he had served as an executor twice before, for the wills of a married couple that were his close friends. However, his appointment was set aside in one case, and he was removed as executor in the other. Gerald testified that a lawyer had prepared the application to probate each will on his behalf in those cases. Gerald was repeatedly questioned regarding the reason he did not timely probate Kara's will. He provided responses that distinguished probate proceedings for his two friends from the instant case, namely: the estates of the friends for whom he had previously filed applications involved "hotly contested issues," and he had filed those applications with the assistance of a lawyer. He testified that, in the instant case, "[e]veryone was following the will," and it was Mary Gale, not he, who was named the executor of the will. He also testified that he was unaware that there was a legal time limit to probate a will.

Mary Gale also testified to the circumstances that followed Kara's death, stating that she had been tasked with providing full-time care for her newly-widowed, sick father, James, while also acting as the primary caregiver for her grandchildren. Mary Gale testified that after James passed and amidst her husband's bouts of unemployment, she began abusing alcohol and was dealing with health issues.

On cross-examination, Mary Gale was questioned about a prior sworn statement she made, wherein she testified:

> In light of these events, it never registered with me that I needed to prioritize the probate of my mother's will. Her will clearly and obviously reflects what she wanted to happen to her property. I simply assumed that is the way it would be, and I was too occupied with these other personal trials and responsibilities to confirm whether I was right or wrong. As soon as I learned that the will needed to be admitted to probate to give effect to my mother's wishes, I sought counsel and immediately applied to have the will probated.

4

Mary Gale maintained that she did not know that the will needed to be probated, was never informed of the necessity, and had she known, she would have acted accordingly.

Mary Gale testified that until she received a demand letter from James Michael in 2023, asserting a claim to one-half of the property at issue, all interested parties under the will had acted under the assumption that the property had already passed in accordance with the will's express terms. At that time, however, James Michael instead sought to have Connie inherit a portion of the property at his passing. Within thirty days of receipt of James Michael's letter, Mary Gale retained counsel and filed the application for probate.

At the outset of Connie's testimony, she explained the nature of her relationship with James Michael. She testified that James Michael hired her to care for his ailing wife, Judith, in 2016, and that Connie began caring for James Michael in 2018 until his death.

Connie testified that Rebecca Amy died intestate in 2021. When Mary Gale and James Michael sought to settle Rebecca Amy's estate, an attorney discovered that Kara's will was never probated and "that is when [James Michael] found out that legally he was 50 percent owner of the property and Mary Gale was 50 percent owner of the property." It is unclear from Connie's testimony whether the need to probate the will was ever communicated to Mary Gale during these discussions. James Michael executed an affidavit of heirship prepared by the attorney so James Michael and Mary Gale "could sell Rebecca's property . . . together"; in the affidavit, James Michael swore that the only property belonging to Rebecca Amy was her residence at the time of her death, and he made no mention of the property at issue.[1] Connie testified that Mary Gale and James Michael had executed a hunting

---

[1]Connie testified that both Mary Gale and James Michael executed affidavits of heirship, but only James Michael's affidavit appears in the record.

lease for the property in 2021, and no taxes had been paid on the property since. She further testified that she was the sole beneficiary of James Michael's estate under his will.

At the conclusion of the hearing, the trial court ordered Kara's will admitted to probate. The trial court subsequently issued findings of fact and conclusions of law that included the following findings:

11. More than four (4) years elapsed between the [Kara's] death and the date that the [w]ill was offered for probate by Mary [Gale];

12. Mary [Gale] exercised reasonable diligence in admitting the [w]ill to probate.

13. Mary [Gale] showed valid excuses for failing to present the [w]ill for probate within four (4) years of [Kara's] date of death, including:

(a) Mary [Gale] did not know that the [w]ill needed to be probated for its terms to be given effect;

(b) Mary [Gale] did not know that the [w]ill needed to be probated within four (4) years of [Kara's] date of death;

(c) All of the beneficiaries under the [w]ill treated [Kara's] property as though it passed pursuant to the terms of the [w]ill;

(d) When one of the beneficiaries, [James Michael], sent Mary [Gale] a demand letter in October 2023 asserting a claim to [Kara's] property, she immediately sought to retain counsel and filed the application to probate the [w]ill in less than thirty (30) days;

(e) During the nine years between [Kara's] death and the application to probate the [w]ill, Mary [Gale] dealt with a number of challenging situations and personal tragedies.

The trial court concluded that Mary Gale was not in default for failing to offer the will for probate within four years of Kara's death and that the will was "entitled to be admitted to probate as a muniment of title only."

6

## II. *Legal Sufficiency*

In a single issue, Connie challenges the legal sufficiency of the evidence in support of the trial court's finding that Mary Gale exercised reasonable diligence in admitting Kara's will to probate.

In analyzing a legal sufficiency challenge, we must determine whether the evidence at trial would enable reasonable and fair-minded people to reach the finding under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *In re Estate of Allen*, 407 S.W.3d 335, 338 (Tex. App.—Eastland 2013, no pet.). We must review the evidence in the light most favorable to the challenged finding, crediting any favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Wilson*, 168 S.W.3d at 821–22, 827. We may sustain a no-evidence or legal sufficiency challenge only when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810. When an appellant does not challenge the trial court's findings of fact, the findings are binding upon both the party and the appellate court if supported by the record. *In re Estate of Richards*, 703 S.W.3d 920, 931 (Tex. App.—Eastland 2024, no pet.) (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986)).

Section 256.003(a) provides, in relevant part, that "a will may not be admitted to probate after the fourth anniversary of the testator's death unless it is shown by proof that the applicant for the probate of the will was not in default in failing to present the will for probate on or before the fourth anniversary of the testator's death." Est. § 256.003(a). "As used in section 256.003(a), 'default' means failure to probate a will because of the absence of reasonable diligence by the party offering

7

the instrument." *Matter of Estate of Masters*, 659 S.W.3d 145, 151 (Tex. App.—El Paso 2022, no pet.) (quoting *Ramirez v. Galvan*, No. 03-17-00101-CV, 2018 WL 454733, at *2 (Tex. App.—Austin Jan. 10, 2018, no pet.) (mem. op.)); *see Allen*, 407 S.W.3d at 339. "Whether the proponent of a will is in default is normally a fact issue." *Allen*, 407 S.W.3d at 339. The applicant bears the burden to show that she was not in default. *Marshall v. Estate of Freeman*, No. 03-20-00449-CV, 2022 WL 1273305, at *3 (Tex. App.—Austin Apr. 29, 2022, no pet.) (mem. op.).

Significantly, Texas case law has been "quite liberal in permitting a will to be offered as a muniment of title after the statute of limitations has expired upon the showing of an excuse by the proponent for the failure to offer the will earlier." *Allen*, 407 S.W.3d at 339–41. "The tendency of our courts has been from its earliest decisions to permit wills to be filed after the four-year period, where there is *any* evidence of a probative force which would excuse the failure to offer the will sooner." *Id.* at 339 (emphasis added) (quoting *Armstrong v. Carter*, 291 S.W. 626, 627 (Tex. App.—Waco 1927, no writ)).

In *Allen*, we considered whether the applicant was in default for having failed to present the will within four years. *Id.* at 336. Although we examined the language of the predecessor to Section 253.006(a), Section 73(a) of the Texas Probate Code, the repeal of the Texas Probate Code and its recodification in the Texas Estates Code resulted in no substantive change. *Compare id.* at 339, *with* EST. § 256.003(a); *see* EST. § 21.001(a). We observed that in probate cases, "[b]ecause the issue of whether a proponent is in default is a question of fact rather than a question of law, the cases must be analyzed in terms of their facts." *Allen*, 407 S.W.3d at 341. In *Allen*, the applicant had relied on the incorrect advice of an attorney, resulting in her belief that probate proceedings were unnecessary and she could probate the will later if needed. *Id.* There was additional evidence that the applicant was seventy-five years old and had no education or background in legal matters. *Id.* Moreover, after learning of

the necessity of probating the will, the applicant acted promptly in filing the application. *Id.* We concluded that the "evidence was legally sufficient to sustain the trial court's conclusion that Appellee was not in default in not probating the will" outside of the four-year requirement. *Id.*

Relevant here, when considering the applicant's diligence, "only the applicant's conduct is relevant to determining whether she 'was not in default.'" *Ferreira v. Butler*, 575 S.W.3d 331, 337–38 (Tex. 2019). In addition to the considerations present in *Allen*—i.e., an applicant's lack of experience in legal matters and reliance on faulty legal advice—courts have also considered an applicant's limited financial resources or language barriers, as well as other extenuating factors. *See Masters*, 659 S.W.3d at 154 (collecting cases); *see also Matter of Estate of Hammack*, No. 12-15-00246-CV, 2016 WL 1446083, at *3 (Tex. App.—Tyler Apr. 13, 2016, no pet.) (mem. op.). In this regard, there must be *some* evidence beyond an applicant's claim of the ignorance of the law. *See Chovanec v. Chovanec*, 881 S.W.2d 135, 137–38 (Tex. App.—Houston [1st Dist.] 1994, no writ).

The case before us shares similarities with the facts in *Chovanec*. 881 S.W.2d at 135. The procedural vehicle was different in *Chovanec*; there, the decedent's husband offered the decedent's will for probate as a muniment of title and the decedent's son filed an opposition and subsequent motion for summary judgment, which the trial court granted based on the expiration of the four-year statute of limitations. *Id.* at 136. However, like here, there was a significant delay in filing the application for probate, with the applicant in *Chovanec* waiting thirteen years. *Id.* After being alerted of the necessity of filing the will for probate, the applicant immediately filed the application. *Id.* at 137. In reversing the trial court, the court of appeals found that there was evidence that the applicant was ignorant of the law *and* did not believe probate was necessary because he had inherited the real property at issue and believed the land was his, which the court held created a fact issue about

9

his default. *Id.* at 137–38. The evidence in the instant case, as in *Chovanec*, created a fact issue regarding default, but unlike in *Chovanec*, the trial court here presided over the hearing and was appropriately positioned to resolve the matter. *See id.*; *see also Hammack*, 2016 WL 1446083, at *4. The trial court, as the factfinder, was the judge of Mary Gale's credibility and was entitled to credit Mary Gale's testimony. *Hammack*, 2016 WL 1446083, at *4.

Quoting *Marshall v. Estate of Freeman*, No. 03-20-00449-CV, 2022 WL 1273305 at *3 (Tex. App.—Austin 2022, no pet.) (mem. op.), to support her contention that the trial court's decision should be reversed, Connie argues that "[a] person who has custody of a will and refrains for the statutory period from presenting it for probate for personal considerations or under the assumption that his title to property is safe without it is in default." The *Marshall* case, however, can be distinguished. In *Marshall*, the executor filed an application for probate of the will as a muniment of title forty-one years after the testator's death. 2022 WL 1273305, at *1. Although there was evidence that the executor did not know of the will's existence for about forty years, upon finding the will, he was advised by legal counsel to probate it but inexplicably waited one year to do so. *Id.* at *4. The court of appeals concluded that the executor's "eleventh-grade education, lack of experience acting as executor of a will, and lack of legal sophistication do not excuse his decision not to apply for probate of the will for a year after his lawyer told him he needed to do so." *Id.* The court further distinguished its facts from those "in which people who had assumed they did not need to probate a will did so shortly after learning of the need to probate the will." *Id.* at *5. Finding no evidence which provides an explanation or excuse for executor's delay for a year after being told to file an application for probate, the court of appeals reversed the trial court's order and rendered judgment denying the application to admit the will to probate as muniment of title. *Id.* at *6. Contrary to what Connie claims, *Marshall* did not turn

on the applicant's knowledge of the existence of a will or possession of the will, but rather, the will was not filed for forty-one years after the decedent's death, and even then, the applicant delayed an additional one-year before filing after having been advised to do so. *Id.*

Unlike in *Marshall*, there was no evidence here that Mary Gale failed to act on any legal advice. *See id.* Although Connie testified that after Rebecca passed in 2021, an attorney was hired, and "that attorney discovered that [Kara]'s will was never probated," Connie was only privy to communications between the attorney and James Michael. Connie stated that Mary Gale and the attorney communicated through e-mail, but the contents of the e-mails were not disclosed. Moreover, it remains Mary Gale's position that she did not learn of the necessity to probate the will until after seeking the advice of an attorney upon receipt of James Michael's 2023 letter claiming ownership in contravention to the will's terms. Then, relying on the attorney's advice, Mary Gale promptly filed the application for probate within thirty days. To the extent Connie additionally argues that Mary Gale failed to promptly act on legal advice, the record does not support this contention.

Similarly unpersuasive is Connie's argument that there was evidence that Mary Gale and Gerald, her husband, possessed the legal expertise to timely probate the will because Gerald had probated two other wills during this same period. Because "only the applicant's conduct is relevant to determining whether she 'was not in default,'" Gerald's prior experience as independent executor of his friends' estates cannot be imparted onto Mary Gale. *Ferreira*, 575 S.W.3d at 337–38. Moreover, there was no evidence that Mary Gale was in any way involved with the probate of those wills. Having reviewed the record, Mary Gale's "legal" experience appears limited to obtaining a mortgage on personal out-of-state property and the execution of a hunting lease for the property at issue.

11

Connie also briefly challenges the evidence supporting the trial court's finding that Mary Gale presented valid excuses for failing to present the will within four years of Kara's death. Although Connie does not address in her brief this finding or the trial court's finding that Mary Gale dealt with a series of "challenging situations and personal tragedies" within the nine years that proceeded Kara's death, we summarize the extenuating circumstances below:

- Mary Gale grieved the decedent's death, which had been "not peaceful and natural but instead was the result of a terrible car/semi-tractor collision";

- Mary Gale provided "full-time care for her newly-widowed and legally blind father who could not live alone, necessitating him moving into her home";

- Mary Gale was required to make "improvements and modifications to the home to accommodate her father";

- Mary Gale arranged and provided transportation for her father's doctor visits;

- Mary Gale located alternative placement for her father after the level of care he required became too great for her to provide at home;

- Mary Gale solely shouldered her father's health decline and subsequent funeral arrangements;

- Mary Gale repeatedly served as the primary caregiver for her grandchildren, who were initially removed from their parents' home due to methamphetamine abuse and later, due to their father's suicide;

- Mary Gale's responsibilities included transporting her grandchildren to and from school and extracurricular activities;

- Mary Gale "[a]bsorb[ed] additional strain when her husband lost his long-term job in 2016 and had difficulty finding work, going unemployed for almost a year";

- Mary Gale became the sole caregiver for her grandchildren after her husband found employment out of state in 2017;

- Mary Gale fell into "a deep depression and beg[an] to abuse alcohol to numb the pain";

- Mary Gale began "[d]ealing with rapidly deteriorating health resulting in part from the effects of full-blown alcoholism" and was placed on a liver transplant list after being given a 50% chance of survival; and

- Mary Gale underwent "intensive testing and therapy" to address her alcoholism.

This evidence—coupled with Mary Gale's testimony that she was unaware of the need to file an application to probate the will and believed it was unnecessary as all the parties had been acting in accordance with the will—was legally sufficient to survive a finding of default. *See Allen*, 407 S.W.3d at 339–41; *Chovanec*, 881 S.W.2d at 137–38.

Accordingly, we conclude that the evidence was legally sufficient to support the trial court's conclusion that Mary was not in default. We overrule Connie's sole issue.

### III. *This Court's Ruling*

We affirm the judgment of the trial court.


W. BRUCE WILLIAMS
JUSTICE


April 9, 2026

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.